May it please the Court, my name is Sergei Shevchenko and I represent Petitioner in this case Natalia Rusak, and I would like to reserve two minutes for rebuttal. I would like to use this opportunity for oral argument to highlight what was already stated in the brief, and the critical issue in this case, whether the action and actual experience that the Petitioner had in Republic of Belarus amounts to fast persecution rather than harassment. The other issue, the key issue in this case was whether fast persecution of Petitioner's mother can be related to her, meaning be imputed. Now the immigration judge denied a solemn case for Petitioner and the Board of Immigration Appeals dismissed Petitioner's appeal. Petitioner argues that cumulative effect of the harm that she experienced in Belarus amounts to fast persecution rather than harassment. Well, the key fact is her father was beaten by the special forces in the Republic of Belarus while she was in the same apartment. Her father deceased five days later as a heart attack as a result of this beating. She herself didn't experience physical harm, but she did experience psychological and emotional harm. Well, in light of precedent cases in this circuit, the physical harm is not required. The psychological or emotional can support fast persecution. Yeah. Now, I noticed that neither side cites the case of Hernando Ortiz written by Judge Noonan. Are you familiar with that case? Are you familiar with that case? I'm afraid not. But this is a case that supports your general view of the law, that is to say that if a child in a family is not himself or herself hurt, but nonetheless the parents or close relatives of that child are hurt, such as to produce psychological trauma for the child, the ill treatment of the parent counts as persecution. I mean, that's basically your argument. The question is whether it goes high enough and so on. But the government is familiar with that case. You didn't cite it in your brief either. No, no, it's not cited in mine. No, neither side did. But anyway, there is that case. Okay. Yeah, the government rejected the argument that the court should consider a family as a social group in this particular case, and that's what it's about, that the harm to the parent of the, in this case, disabled person, which means that any kind of experience that, you know, she would, in essence, she would be more sensitive to the harm than rather just a regular person. She became deaf when she was three years old, and due to the mistreatment by the doctor's office, she was prescribed a strong, you know, medicine that resulted in she became totally deaf, you know. But that's not mistreatment of the parents that you're describing right now. No. No, that's a part of it. I'm just saying that her experience would be enhanced because of her disability status. She was very dependent on her mother. At this point, she's 30 years old, and she still resides with her mother, who is now a U.S. citizen. Right. Can we concentrate? Okay. I'm trying to concentrate on the derivative claim, the claim that the persecution of her mother should be, that she should be the beneficiary of that. Right? Are you making that argument? Well, when the petitioner entered the United States, she was still a minor. Later on, when the mother filed an asylum application, she included the petitioner as her child. Thereafter, she married a U.S. citizen, and she terminated the asylum claim. So therefore, the petitioner filed her own claim in her own name. Right. So what is the basis, I guess? The family is a social group, meaning that what I'm trying to argue, that we have to consider harm to the closest relative of the petitioner. That's what I meant. She was only over 21 at the time she filed her own, you know, asylum claim. That's what I'm asking you. So are you saying that the basis of the asylum claim for your client is the persecution that was suffered by her mother? Mainly, yes. Mainly, yes. So then the question I have is, how was that persecution, how was she affected by that persecution? Because it appears that the record reflects that she wasn't really an active participant in the Seventh Day Adventist denomination. And one of the issues was that to engage, fully engage in activities, she does need a sign interpreter. But she attended, and I think the record is clear about that, a few times a session per month. And she also, when they moved to the United States, she also attended the church as Mother did. Could you just outline for us what bad treatment her parents received while she was a child in the home country? As to her disability? No, no, no. What bad treatment did her parents experience? Not her, based on her deafness, but rather what discrimination and what persecution did her parents suffer while they were back in Belarus? Well, most parents of a petitioner belong to an Adventist church, which has issues with the current government authorities in Belarus. And there's also human rights reports showing that this is an ongoing problem. Now, the most severe thing was that when they came to their apartment, and I'm referring to security forces, they beat her father so severely that he got a heart attack and deceased in five days. And that's in the record. Didn't she also testify that her mother had been detained, beaten, persecuted, tortured, and raped by the police? Yes, in addition to that, her mother was detained a few times. More than just detained, according to the testimony of your client. I believe she says that her mother had been detained, beaten, persecuted, tortured, and raped by the police. Yes, the same was stated in the application. So, I first want to concentrate. Sorry, in her application. No, no. Yes, that was in her application. The problem is she did not witness any of this. She's relating what was told to her about what happened. This is true. It didn't happen in her presence. That's absolutely true. But given her status of being a disabled person, very dependent on her parents, you know, so she was very close. And the proximity of events, we're not talking about that she was in some other city or somewhere else, you know. She depended on her parents in a daily life. So, meaning that whatever the action might happen, you know, she would be related to her within a short period of time. Okay. And as I mentioned, she's 20 years old and still mother taking care of her. Okay. Why don't we hear from the government? You've got a little time for rebuttal, and we'll make sure that you have an opportunity to say what you need to say. Thank you. Appreciate it. Good morning, Your Honors. May it please the Court. My name is Ashley Martin, and I represent the Respondent in this matter. I'd like to begin by addressing this Court's decision in Hernandez-Ortiz. In Hernandez-Ortiz, the Court held that Hernandez-Ortiz, which neither side has mentioned in his brief. That's correct, Your Honor. And I suspect not mentioning on the other side's brief because he was unaware of it because it helps him. Were you aware of it at the time you wrote your brief? Your Honor, I did not write the Respondent's brief in this case. I see. Okay. I did. There's a general sense, not only of good practice, but even of ethical responsibility, that an attorney is required to cite authority contrary to his or her position. And you might want to go back and tell the person who wrote the brief that Hernandez-Ortiz was there, should have been dealt with, is contrary to your position, may or may not be fatal to your position. But if you have opportunity to speak to the person who wrote the brief, you might ask him or her. Let's see. Sounds like a Reagan, I don't know, him or her. Him. Yes, sir. Number one, was he aware of the case? And number two, if he was, why didn't he cite it? Okay. Yes, Your Honor. We'll put that behind us. Okay. Now let's just look at the case. All right. The holding in Hernandez-Ortiz is that injuries to a family must be considered in an asylum case where the events that form the basis of the past persecution claim were perceived when the petitioner was a child. Right. Here, the agency did consider the harm to Ms. Rusick's mother and the beating and subsequent death of her father. Now, the agency does not cite the case. Is that right? That's correct, Your Honor. And so tell me in what way they considered the injury to the father and to the mother. Well, both the immigration judge and the board reviewed these incidents in their decisions. Well, at the time of the immigration judge's decision, the Hernandez case hadn't been cited. That's correct, Your Honor. So tell me why that case has been taken into account, even though the case is not cited, when we get to the BIA. Well, I apologize. I didn't mean to indicate that the immigration judge was specifically thinking about Hernandez-Ortiz. Right. Okay. But what I'm really after is I understand the thrust of your argument, which is to say that even though the BIA didn't cite Hernandez-Ortiz, it essentially understood the principle, applied it, and denied relief. Point me to the part of the BIA's decision in which I could conclude that. All right. On page 2 of the record, the board considers that, let's see, the board reviews the fact that the mother was arrested more than one time. Where is that cited? Page 2 of the record, and this is the third paragraph of the board's decision. The board says, in the final sentence of the third paragraph of the decision, although condemnable, the actions taken against the Respondent's parents due to their religion, including the Respondent's mother's arrest and the father's beating and subsequent death, do not constitute persecution of the Respondent. Yes. And as I read that sentence, it's directly contrary to our decision in Hernandez-Ortiz, because as I read that sentence, they're saying, listen, she had to experience it herself in the sense of herself being mistreated, instead of, as we've now held, and I gather the BIA simply wasn't aware of the opinion of Hernandez-Ortiz, we now say if the parents or members of the family are persecuted, a child who knows about this can be traumatized and it counts as persecution to the child. It sounds as though they just are not applying that principle. Well, Your Honor, I believe Hernandez-Ortiz is distinguishable from the present case because the applicant here still bore the burden of showing why her parent the persecution of her parents caused persecution to her. In other words, she didn't submit any evidence of the harm to herself as a result of the persecution of her parents. Well, what evidence does she need to do other than the fact that she was a child at the time? Well, I'm thinking of evidence such as testimony about the lingering effects of her father's death on the family. In fact, in Hernandez-Ortiz, there was psychological testimony that said these children perceived the harm at the time that it was being applied to their parents and they were traumatized by it. So there was evidence in the record that at the time that the persecution was taking place, the children were impacted by the persecution personally and perceived the persecution upon their parents. Well, if that's correct, the Petitioners in Hernandez-Ortiz submitted a psychological report detailing the trauma that they experienced as a result of their brother's death and as a result of their forced sudden evacuation of their hometown in Guatemala. Here, there's no comparable evidence. Despite the fact that she had the opportunity to do so. Well, she had the opportunity to do so. Excuse me, the opportunity to do so. But Hernandez-Ortiz wasn't on the books yet. Not at the time of the immigration judge's decision. So the evidence that she presented was presented in the context prior to her decision. That is correct, Your Honor. But she still, at the time of the immigration judge's decision, bore the burden of establishing her eligibility for asylum. Here, the nature of her claim really was derivative of her mother's initial asylum claim. She was listed as a derivative asylee in that application. Right. And the mother withdrew that application. So then she files an asylum application in her own right. In support of that application, she relies on the beating and death of her father and her mother's arrest, but fails to explain to the immigration judge or provide any evidence as to how that. Do we know from the record, can we piece it together, how old she would have been when this happened to her parents? Yes, Your Honor. She testified that she was approximately 11 years old at the time that her mother was arrested in 1995. She was approximately 12, or just a few days shy of turning 12, when her father was beaten and died. And what evidence do you think we need to tell us or tell the immigration authorities that it would be traumatizing to an 11- and 12-year-old girl to have her father beaten and suffer a heart attack immediately thereafter, to have her mother in prison beaten and raped? I mean, do we need expert testimony to suggest to us that that would be traumatizing to an 11- and 12-year-old girl? No, Your Honor. I don't mean to suggest that expert testimony or a psychological report would be required, but she could certainly provide her own testimony as to the effects of these events on her and her family, and she did not do so. Well, I know she didn't do so, and I understand why she didn't do so. Hernandez-Ortiz wasn't on the books, and her attorney did not anticipate the possibility of Hernandez-Ortiz, even though whoever the lawyer was, Hernandez-Ortiz, pretty good, made a record hoping that the law could be made explicit to do this. That's just what didn't happen in this case. At a minimum, it seems to me we have to remand for the BIA and probably the IJ to reopen, allow testimony to be taken or at least have the effect of Hernandez-Ortiz. I'm not at all convinced that testimony would be required by the BIA once Hernandez-Ortiz is cited to them. Well, Your Honor, without evidence of the harm to the applicant herself, that would be the case. I'm saying is, now, this is presuming a little bit that I'm sitting in the position of the BIA or the IJ. Were I the IJ and I heard that this had happened to the parents when she was 11 and 12, I don't need much evidence that this would be traumatizing to an 11- and 12-year-old girl. I might even be willing to presume it even in the absence of a statement. Well, the question becomes whether or not Hernandez mandates the presumption of trauma or whether there has to be some evidence in the record. That's what I'm struggling with. I'm not sure. Yeah, that's the question. Yeah, that's the question. I'm not sure that Hernandez-Ortiz says in the absence of any evidence on the part of the petitioner who has the burden that there has to be a presumption of trauma and that has to be considered. I'm not sure Hernandez-Ortiz goes that far. And I'm assuming that's why I wasn't cited because, to me, this case is not even close to Hernandez-Ortiz. Well, I agree with you, Your Honor, and I think that to presume, I think that the petitioner's position is asking the court to simply presume harm and to presume harm. But he doesn't even know the case. Yeah, and that's the problem. I don't think it's our burden to make a case for the petitioner. And that's the problem I would have with sending it back because I think then you're giving them a do-over when they didn't meet the burden in the first instance. Correct. Does the PIA have an obligation to apply the correct law in the absence of citation of a particular case? Let me ask you this way, and I've not gone back to look. Was she represented when the appeal was taken from the IJ to the PIA? Yes, Your Honor, she was. And it is the, whenever an applicant is appealing to the board, it is that individual's responsibility to call the board's attention to the alleged errors in the immigration judge's decision. Well, they clearly called attention to the facts and the record. They may or may not have cited the right case. I suspect, I'd need to go back. But if they're not citing the right case to us, I doubt they cited the right case to the PIA. I'm sorry. Your Honor, I assume that it's the fact that the mother is not an American citizen because she's an adult. The mother can't make an application to adjust, or she can't make an application to adjust her status based on her mother's citizenship, or can she? Your Honor, that actually depends on whether or not she's, actually, sorry, I have the visa bulletin with me. She could seek a visa based on the fact that her mother is now a U.S. citizen. The preference category that she would receive would depend on whether or not she's married or unmarried. I'm sorry. Let me check the bulletin. I believe her, yes, I believe that her visa preference category would depend on whether or not she's married. If she's unmarried and her mother is a U.S. citizen, she may have a relatively high preference category with a visa. And if she does have a visa that is based on an I-130 petition that's been approved and has a current priority date, she may be able to adjust. The government is not aware in this case of any indication that she has an approved I-130 or a visa that's available to her right now. She may not have a competent lawyer, but that's sort of a separate issue. So let's assume we agreed with your position and affirmed she could still apply for an adjustment of status. She could, but she would need to get the Department of Homeland Security to join her in a motion to reopen her removal proceedings before the agency so that she could file the adjustment application with the agency. Would you object to a remand to the BIA so that it could consider the effect of Hernandez-Ortiz on this case? Yes, Your Honor. The government does object to that because we believe that this case is distinguishable from Hernandez-Ortiz due to the lack of evidence of harm to the applicant herself. And you would object to a remand to allow evidence to be presented? Yes, because the applicant didn't claim before the board or in her opening brief to this Court that she was denied the opportunity to present any and all evidence in support of her asylum application. Okay. Listen to what you're about to do here. Here's a girl who's deaf from birth. She testifies that she's totally dependent upon her mother. And you're going to send her back to Belarus deaf and incapable, essentially, of fostering in that society without allowing her to present evidence under our law, which may, I say may, entitle her to asylum. Is that the position you're taking? Your Honor, the government's position is that the agency's final decision in this matter is It only requires a yes or no answer. That's a little unfair, actually. That question's a little unfair. Well, I have to say the question is a little bit, how do I want to say it, unsympathetic to the government. And I distinctly, I mean, this is not hostile to you, but it is unsympathetic to the government. I agree with that. Well. Would you actually deport this woman to Belarus? To Belarus. Do we do that? Do we do that? Given these country reports, including the most recent one, which admittedly is not part of the record, but I suspect for these purposes we could, for the purpose of my question, we could take judicial notice of it. We actually send people back to Belarus? Your Honor, I would have to check with the Department of Homeland Security. I don't know the answer to that question. I can find out to the best of my ability and file a supplemental pleading with the court if you think that would help. The government's responsibility is to apply the laws as they're written. They may be harsh the way they're written, but that's the government's obligation is to apply the law as it's written. Well, I agree, Your Honor, and I think that in this case presuming harm to the applicant based on the experiences of her parents would actually obviate the need for the derivative asylum provisions. I mean, if every asylum applicant could establish eligibility based on harm to their parents, there would be no need for derivative asylum. Well, at some point I guess you're just objecting to our decision in Hernandez-Ortiz because we have clearly said that if the trauma to the parent is sufficient and the child is of tender years, that suffices. That's just the law. Well, Your Honor, I didn't mean to ---- It's a question of degree. I understand that. Correct. It's a question of perception, what the child actually experienced. I believe that the critical difference between this case and Hernandez-Ortiz is the relative lack or actual complete lack of evidence in this case of harm to the applicant. In Hernandez-Ortiz, they had much more, including the psychological report. Could I ask you to go back to Judge Fletcher's question, which has been characterized as unfair? I said a little unfair. A little unfair. I'm never more than a little unfair. The government has discretion here. They don't have to deport her, so his question is not unfair. In fact, without being critical of the President, we are not applying the immigration laws as they are written, despite how tough they are. We're not deporting under certain circumstances children who are illegally in the country. The President has said, in fact, they can get employment, even though it's illegal for somebody to employ an illegal alien. So there is an element of discretion here in terms of taking into account the harshness of a particular outcome in terms of deporting. Well, the Department of Homeland Security does have prosecutorial discretion, and I believe that Your Honor is referring specifically to the Deferred Action for Childhood Arrivals Program. Applicants are eligible for relief under that particular program if they entered the United States before the age of 16. No, no, I'm not saying that it's the same thing. All I'm suggesting is it's an example of how the executive has discretion to apply or not apply the immigration laws, however harsh, because, perhaps, of the harsh results that applying them to the letter entail. Well, that's correct. The Department of Homeland Security does have that discretion, and Petitioner's Counsel certainly has the ability to contact the Department of Homeland Security about this case and request consideration for prosecutorial discretion. But do you have authority to exercise that discretion? No, Your Honor. The Office of Immigration Litigation does not have the authority to exercise prosecutorial discretion. Here's a possibility that occurs to me. Sometimes we are successful, or we, I should say, sometimes our mediation office is successful in resolving cases maybe such as this one. Would the government object to mediation? Well, Your Honor, the government's not aware of any relief that the petitioner can receive following a remand to the board. I mean, without evidence of there being a visa immediately available to her, the petitioner can't adjust her status right now. But can discretion be exercised on the part of Homeland Security in the context of mediation? In the context of mediation, I do have the ability to reach out to the Department of Homeland Security and ask them if they wish to exercise prosecutorial discretion in this matter. Well, there are two things you could reach out for, because there's the issue of her ability apparently to apply for adjustment of status for which she would, as you indicated, need the permission of Homeland Security. So if they gave her permission to apply for adjustment of status, that might be a way of resolving this whole case without possibly making what you might characterize as bad law on the issue that we've been discussing in terms of the impact on the child. Right. So there's two, there are really two ways conceivably to resolve this case. One is by giving her permission to file an application for adjustment of status based on her mother's status, which drops out of the case all of the legal issues we've been discussing or to exercise discretion to allow her to remain in the case, particularly given the conditions in Belarus. Correct. Well, Your Honor, absent the government having any knowledge of whether or not she has that visa available to her, I am reluctant to say that I think that mediation would be productive. However, I mean, if the panel does order mediation in this case, the government would certainly participate. Well, I'm generally not inclined to order mediation. Generally, if the parties are willing to mediate, I'm amenable to ordering it to mediation. But I don't think it's productive to order people to mediation unless they're receptive to the concept. That's just me personally. I don't know how the other members of the panel feel. Well, the government is amenable to mediation to the extent that we could find out whether or not she actually is able to adjust her status. And we could certainly, we're certainly willing to participate in mediation to that extent to explore what type of relief may be available to her. Well, if we were to send this to mediation, I don't think we would restrict the mediation in any way. I mean, that would be up to whatever happens in the mediation. You know, it may be that, for example, during the mediation, that application for a visa would be a good solution. It may be that prosecutorial discretion and backing off would be a good solution. It may be, and I'm not prejudging this, that a proffer from her as to how old she was, what she knew, and what trauma she had might affect the government's position with respect to Ortiz-Hernandez. I mean, not all of those things seem to me at least possibilities. Well, Your Honor, the government's amenable to mediation. What I would request is that we have the ability to request that this case be sent back to the panel for a decision in the event that it becomes clear that mediation would not be fruitful. That's an automatic. Okay. You don't even have to request that. That's what happens. All right. Sure. Okay. All right. If Your Honors don't have any more questions for me, I... Thank you. Thank you for your help. Okay. Have you applied for an adjustment of her status based on her mother's American citizenship? Technically, no. Technically? Yes. What does that mean, technically no? Just almost immediately after her mother was granted permanent resident status, she filed an immigrant visa relative petition, which was already approved. According... Now, although beneficiary... Okay, beneficiary is still a married person. Now, by operation of law, since mother became a U.S. citizen, now it's converted to a first preference category. And the priority date will be coming approximately seven, eight months from now on. Now, the real issue here for adjustment of status is to be eligible to adjust status in the United States, the beneficiary and the preference category must be in status. And the beneficiary is not in status. What does that mean? Meaning that a person should be in some kind of whether nonimmigrant lawful status during all the period of time pendency of the immigrant visa petition. Now, this exception in immigration national law, which allows exception to that situation where a person lost her lawful status for some technical reason beyond person's control. Now, in this situation, she was a minor. Obviously, she could not make her own decision whether to stay in the United States, whether to apply to asylum when she entered the United States. Now, if the government would be open to concede such eligibility, yes, one of the possible, you know, resolution of this case may be reopening and termination of removal proceedings and allowing her to adjust administratively before the U.S.CIS. All of those would be possibilities that could be explored if you were to go to mediation, right? Right. So you, I'm assuming you would also be agreeable to mediation. Yes. And I also would like to ask. And I assume nothing prevents you. I'm not sure that I understood your answer to the last question, but nothing prevents you from filing an application for adjustment of status right now, more than just in what you described as the technical sense. Well, jurisdiction belongs to the, right now, to the Executive Office of Immigration Litigation. Now, when the, it was more than 90 days since the final decision by BIA, so she cannot, she doesn't have a right to apply. I mean, she can ask source pointer treatment of her motion to reopen and terminate proceedings before the Board of Immigration Appeals, but that's up to their discretion. So you need to, in other words, you would need to get permission. You would have to get agreement from the office. Correct. Either, so there's two ways to approach. Either ask the government to join such a motion. Then it's irrelevant whether 90 days passed or whether there was previous motion ever were filed. The other one is up to the discretion of the Board of Immigration Appeals. Now, honestly, that's the step. I'm sure we need to make the mediation argument in front of this panel. Correct. Let me give you one citation. Catch a pencil. Say when you're ready. I'm ready. Hernandez-Ortiz, 496 F. 3rd, 1042, 9th Circuit, 2007. Did you represent the petitioner before the immigration judge and the BIA? I just appeared at the last hearing where the testimony was taken prior to my appearance. Okay. Now, I also would like to ask this panel to allow for a supplemental brief where we can address the issue and application of Hernandez. I think we're likely at this point to send it to mediation. And if mediation succeeds, we'll never see the case again. If the mediation fails, it comes back to us. And at that point, we would order supplemental briefing if we wanted to. Okay. I appreciate it. That's fair. Okay. Ruth Stock versus Holder now submitted for decision.
judges: Korman, Fletcher, Rawlinson